ColliNs, Judge,
concurring:
I concur in the result reached by the court because the record fully supports the position that for the PEB to have awarded plaintiff a separate rating under VADC 5311-12 would have amounted to forbidden “pyramiding.” Once it is determined that a separate rating would amount to “pyramiding,” however, I believe it unnecessary, and perhaps erroneous, to further state that “the diagnostic codes dealing with muscle injuries [VADC 5311-12] apply only where there has been a direct trauma to the muscles themselves * * To my mind this is an interpretation of the codes which, regardless of its correctness, the court is certainly not required to advance at this juncture.
As an aside, I would add that this case points up well an inherent inequity of the present physical disability rating *480 system. Here is a plaintiff whose actual disability was, and is, at least 30 percent, and whose physical condition is expected to deteriorate. Nevertheless, this plaintiff, with a service-connected injury of major proportions, will never receive disability retirement pay because his legal disability is only 20 percent. Surely, this is an area where law and reality should coincide. Unfortunately, they dp not. Here wrong rules and “waiting Justice sleeps.”
DurKee, Judge,
joins in the foregoing concurring opinion.
FindiNgs op Fact
1. Plaintiff, who was born on December 28, 1912, is a citizen of the United States and a resident of the State of Virginia. He enlisted in the Delaware National Guard on February 4, 1935, and was honorably discharged on January 1, 1936. He was appointed a Second Lieutenant, Coast Artillery Corps (CAC), Officers’ Reserve Corps (ORC), on May 21, 1936, and accepted the appointment on May 23, 1936. Plaintiff was transferred to the Inactive Reserve, promoted to First Lieutenant, Inactive Reserve, on August 15, 1939, and accepted the appointment on October 14, 1939. He transferred to the CAC, ORC, on January 2,1941, was promoted to Captain, Army of the United States (AUS)., on April 30, 1942, and accepted the appointment on May 1, 1942. He was promoted to Major, AUS, on January 27, 1943, and appointed Major, CAC, ORC, on November 30, 1945. Plaintiff was promoted to Lieutenant Colonel, AUS, on December 28, 1945, and to Lieutenant Colonel, CAC, ORC, on July 21, 1947. He was federally recognized as a Major, CAC, Virginia National Guard, on November 23, 1948, and appointed Major, CAC, National Guard of the United States (NGUS) on January 26, 1949, which he accepted on February 15, 1949, thereby terminating his ORC status. Plaintiff was federally recognized as a Lieutenant Colonel, CAC, on December 19, 1949, and appointed Lieutenant Colonel, CAC, NGUS, on April 4,1950, which he accepted on April 14, 1950. He was federally recognized as a Colonel, CAC, bn July 24, 1950, and appointed Colonel, CAC, NGUS, on *481 August 1, 1950, which he accepted on August 9, 1950. He was appointed Colonel, AUS, on August 14, 1950. Plaintiff’s AUS status terminated on August 14, 1952. He was transferred from NGUS to the U.S. Army Reserve as a Colonel on April 16,1958. He was transferred to the Retired Reserve on April 17, 1958, and is presently a Colonel, Retired Reserve.
Plaintiff served on active duty in an enlisted status for a short period in August 1935. Commencing in June 1936, he served on active duty as a commissioned officer at various times through August 1957. He was in a patient status at Walter Reed Army Hospital (WRAH) from October 10, 1956, to March 1, 1957, and from November 4, 1957, to February 10, 1958. On April 15, 1958, plaintiff’s commission as a colonel of the active National Guard, was terminated by vacation of his commission due to physical disability.
At various times during his periods of active duty, plaintiff had been given physical examinations and on each occasion prior to August 12, 1956, was found physically qualified for general military service. On two of these occasions, the medical examiner made note of an old injury to the right ankle suffered by plaintiff while playing football in the early 1930’s. In a report of physical examination on August 7, 1952, the medical examiner noted a history of removal of a “chip right ankle” in 1935, with healed scar on 'lateral aspect, but reported that plaintiff had a good range of motion of the ankle. The examiner also stated that plaintiff had occasional “pain on prolonged walking or weight bearing” and had arthritis of the right ankle secondary to fracture. At the trial here, plaintiff denied making such complaints to the medical examiner. In any event, he was found physically qualified and given a l-l-l-l-l-l physical profile.
2. On August 12, 1956, plaintiff sustained a fracture of the right medial malleolus[1] while on active duty with the Virginia National Guard. Plaintiff had stopped his staff car with the intention of helping some people involved in an *482 accident. While he was endeavoring to assist them, their car was struck by a truck which overturned the car, knocking plaintiff down and pinning both of his legs beneath the car. He was taken to the United States Naval Hospital, Quantico, Virginia, and on August 14,1956, underwent open reduction and internal fixation, with a single screw, of the right medial malleolus (lowest point of the tibia).[2]
On October 2, 1956, he was transferred to the Station Hospital at Fort Lee, Virginia, so as to enable him to receive further treatment at a medical facility closer to his home. He was transferred to Walter Reed Army Hospital (WRAH) on October 10,1956, because of evidence of delayed healing.
3. Plaintiff was hospitalized at WRAH from October 10, 1956, to March 1, 1957. A narrative summary dated February 28, 1957, contains the following pertinent information:
* * * * *
Course in the Hospital: Following admission 10 October 1956, routine laboratory and x-ray studies were performed. The patient had his plaster changed for purposes of wound inspection and determination of condition of the skin. He was placed in a short leg walking plaster 25 October 1956 and encouraged on ambulation. In early December, the patient was granted a thirty-day convalescent leave in a new walking plaster cast. On his return 10 January 1957, the patient was fitted with a molded arch support and allowed to ambulate with crutch support in store shoes. Patient referred to Physical Medicine Section for appropriate range of motion and muscle strengthening exercises of the right lower extremity. * * * Patient continued to gradually improve throughout January and February, principally with decrease in the amount of swelling and slight gain in the range of motion of the ankle with less pain. As the patient is now being discharged, he has minimal residual swelling without tenderness about the joint. He has a 20 degree range of motion, from 85’degrees of dorsiflexion to 15 degrees of plantar flexion. Inversion and eversion are essentially .normal.
i* *1* -I» *i*
*483 Diagnoses: 1. Fracture, simple, n.e.c., medial malleolus right ankle * * *.
Condition on Discharge: Improved. Prognosis, patient runs a definite risk of further difficulty with this ankle in the form of traumatic arthritis. It is recommended that the screw be removed, but not earlier than one year from insertion.
4. X-ray studies of plaintiff’s right lower extremity during hospitalization at WRAH revealed the following:

October 19,1956:

AP, lateral and oblique views of the right ankle through plaster show the fracture of the medial malleo-lus. The fragment of the medial malleolus is fixed to the shaft of the tibia by a metallic screw. There appears to be some lateral displacement of the talus showing some instability of the ankle mortise. There appears to be some sclerosis of the distal medial malleolus suggestive of aseptic necrosis. A fracture cannot be delineated through the lateral malleolus through plaster.

November 27,1956:

An examination of the right ankle in AP, lateral and oblique projections shows an old fracture of the medial malleolus. The fractured fragment is held in good position and alignment by means of a full-threaded arthrod-esis screw. There is, however, a rather marked increase in the density of the fragment indicating probably an aseptic necrosis of this fragment. When compared with a film of 19 October taken through plaster, there has been no appreciable change in the appearance of the fracture. Again noted is the rather marked deossification of the bony structures of the foot presumably on the basis of disuse.

J<muary 8,1957:

AP, lateral and oblique views of the right ankle shows no appreciable change when compared with the exam of 27 November 56. In the view with the foot turned medially there appears to be some widening of the ankle joint space laterally. The dense fragment off the medial mal-leolus which is fixated to the major portion of the tibia with a screw again appears dense and probably represents an aseptic necrosis. No sequestra can be visualized.

*484
February 71957:

An examination of the right ankle in the AP, lateral and oblique projections shows the area of the old fracture of the medial malleolus. The fracture fragments are held in good position and alignment by the means of a full threaded arthrodesis screw. There is considerable deossi-fication of the bony structures about the ankle joint presumably on the basis of disuse. The tip of the medial malleolus is slightly more sclerotic than the surrounding bones indicating a slight if not complete deficiency in blood supply. There are irregularities about the lateral malleolus indicating the possibility of an old injury in this area as well.
5. On August 13, 1957, a physical profile notification was issued by Colonel Milton S. Thompson, Marine Corps, of the Walter Reed Army Medical Center (WRAMC), to the Commanding Officer, Artillery, Headquarters, Virginia National Guard, Richmond, Virginia. The profile rendered was 1-1-S-l-1-1 for a “Broken ankle, right.” The notification stated plaintiff was not to engage in any running, jumping, long standing or long marching. The condition was considered to be “temporary.” It was stated that plaintiff was to report to a medical facility for reevaluation in February 1958.
6. On November 4,1957, plaintiff was readmitted to Walter Reed Army Hospital for removal of the screw from the right medial malleolus. The screw was removed on November 6,1957, and upon a review of the X-rays and history, the Chief of the Orthopedic Service agreed that plaintiff probably had traumatic arthritis of the right tibiotalar joint.
7. An undated Clinical Narrative Summary, prepared while plaintiff was hospitalized at WRAH for the removal of the screw but before the Physical Evaluation Board’s (PEB) proceedings, contained the following pertinent information f
* * * * *
HISTORY OF PRESENT ILLNESS: This 44-year-old National Guard Colonel sustained a fracture of the ■right medial malleolus on 12 August 1956 while on active duty with the Virginia National Guard. * *
He was treated at Walter Reed AH with application of a short-leg walking plaster in which the patient ambulated for approximately 2y2 months, after which he was [referred to thé Department of Physical Medicine for *485 appropriate range of motion ana also strengthening exercises to the right lower extremity. His fracture site seemed to have healed well and the patient was discharged from Walter Need AH on 28 February 1957, having a 20-degree range of motion at the right ankle (from 85 degrees of dorsiflexion to 105 degrees of plantar flexion) by standards of the VA — plate II. Inversion and eversion were essentially normal and there was minimal swelling with reportedly no tenderness about the right ankle joint. The patient stated, however, that since his discharge he had been unable to run, walk rapidly, turn abruptly or feel comfortable with respect to his ankle unless he was sitting or lying down. He also had been walking with a very definite limp and had occasionally needed a cane for prolonged walking. He was admitted to Walter Reed AH this time for removal of the screw from the right medial malleolus.
PHYSICAL EXAMINATION *** of the right ankle revealed plantar flexion to be limited to 135 degrees and dorsiflexion to be limited to 90 degrees with the knee extended and 95 degrees with the knee flexed. Inversion and eversion were only slightly limited passively but moderately limited actively. There was subjective pain with the extreme ranges mentioned. The entire remainder of the physical examination was within normal limits.
LABORATORY DATA: CBC, urinalysis, and serology were within normal limits. Examination of the right ankle by x-ray in the lateral, AP and internal oblique projections revealed a marked osteoporosis of the bones of the foot and lower leg. * * * *****
PRESENT CONDITION: * * * He walks with a definite limp and after ambulating for a short while there is some slight swelling of the right ankle, associated with subjective tenderness over the area of the tibiotalar joint. Dorsiflexion is limited to approximately a right angle and plantar flexion is limited to 135 degrees (by YA plate II methods). Inversion and eversion are only slightly to moderately limited and produce no pain. The midtarsal joints appear clinically and functionally within normal limits. The patient states that he cannot run, walk rapidly, turn abruptly, or feel comfortable on his feet. He states that he is limited even in driving a car in that pressure on the brake pedal or even prolonged pressure on the accelerator gives him pain in the ankle.
*486 DIAGNOSIS: Arthritis, due to direct trauma, right ankle, incurred 12 Aug 56 when officer sustained a fracture of medial malleolus while on active duty with Ya Nat’l Guard. * * *
RECOMMENDATIONS: This patient’s prognosis for military service within his MOS is poor; for life in general it is good. There will probably be minimal change in his condition in the next five years which would not affect his fitness for active duty or disability rating. Further hospitalization is not necessary. The Medical Board finds this officer medically unfit for military service and recommends that he be presented to a Physical Evaluation Board.
8. While at WRAH, plaintiff expressed a desire to appear before a medical board, and on December 16,1957, a medical board convened and made the following diagnosis:
7240 Arthritis, due to direct trauma, right ankle, incurred 12 Aug 56 when officer sustained a fracture of medial malleolus while on active duty with Ya Natl Guard. LOD: Yes, per telecon with Major Buckles, Surg Off, NG Bureau, Wash, D.C., 8 Oct 56 (YA Code 5019, arthritis, right ankle, due to direct trauma, mild, manifested by limitation of plantar and dorsiflexion, subjective tenderness and swelling on moderate ambulation, and with minimal changes demonstrable radiologically).
The medical board made the following findings: that plaintiff became incapacitated on August 12,1956; that the cause of the incapacity was an incident of service; that it did not exist prior to entry on active duty; that the degree of disability for military service was total and permanent; that no type of service was recommended; and that plaintiff should be separated under the provisions of Paragraph 15(b) (2), AR 40-212.
9. The findings of the medical board were approved by the Executive Officer of WRAH on December 17, 1957, and as reported in an Opinion of the Physical Evaluation Board (Informal Hearings), dated December 18,1957, plaintiff was found 10 percent disabled and was recommended for separation with severance pay. Plaintiff did not concur with the PEB’s informal recommendation and demanded a formal' hearing.
*487 10. On December 23, 1957, a" formal EEB was convened, and plaintiff appeared with appointed military counsel. During the course of the PEB hearing, the following medical reports were received in evidence:
(a) A report under date of September 19, 1957 by Dr. William Minor Deyerle, a private physician, who had examined plaintiff on September 9,1957. The report, in pertinent part, stated the following:
Examination reveals one and one-half inch atrophy of the right calf muscles. The patient lacks fifteen degrees of emersion and five inversion and lacks ten degrees of dorsiflexion. He has normal plantar flexion. The ankle is definitely swollen and crepitates. There is pain on extremes of motion attained. The patient walks with a definite limp. He is unable to raise his weight on the toes of the right foot and is unable to push off with the front part of the foot in a normal way when he walks. There is a three inch well healed scar over the inside of the right ankle. There is a barely visible five inch scar over the outter [sic] side of the same ankle. The patient has tenderness over the right ankle joint, most marked in the region of the medial malleolus. Examination of the chest and the opposite limb which were also slightly injured at the time of the accident were completely normal.
X-rays of the injured ankle revealed a well healed fracture of the medial malleolus. X-rays taken of the chest revealed no abnormalities. X-rays taken at Quan-tico at the time of the injury and also at Walter Reed Hospital during the time of progress were reviewed. The x-rays taken at Quantico revealed a typical fracture of the malleolus, medially, with marked displacement of the fractured fragment approximately one half inch. There was also an additional fracture of the front part of the tibia and a sliver of bone at the point of attachment of the capsule. X-rays taken at Walter Reed showed evidence of traumatic arthritis with some roughening of the joint surfaces. Recent x-rays show essentially the same change with some slight progression of the changes, described. The screw that holds the fracture in place is approximately two inches long and is well placed.
This patient had a fracture of the ankle which is very slow healing, requiring prolonged immobilization. As a result of the fracture and the prolonged immobiliza *488 tion, the patiept has symptoms of traumatic arthritis secondary to the fracture. The pain and limitation of motion in the ankle cause the patient to walk with a definite limp. This patient will probably be improved some but he will always have permanent limitation in this extremity and will always have a limp. He may be able to resume some of his previous activities physically but this will have to be accomplished in spite of considerable handicap in the way of pain and limitation of motion in the ankle. I would estimate that he has thirty-three and one-third percent loss of use of the right ankle and foot.
(b) A supplementary report by Dr. Deyerle who reexamined plaintiff on December 19, 1957. In that report Dr. Deyerle stated, in pertinent part:
*****
Mr. Thompson was last seen by me on December 19, 1957. He has recently had a screw removed from his fractured ankle. These Wounds healed nicely, however, the overall picture in reference to his ankle has not been changed. He still has the limitation of motion described, the pain on extremes of motion. He walks with a definite limp. He has marked weakness and is unable to raise upon the toes of the injured foot even with considerable aid from both hands. In other words he has lost the power of pushoff from the front part of his foot which makes for a normal gait, and also the lack of this pushoff causes other fatigue.
As I stated in my report of September 19? 1957,1 feel this man’s condition is permanent. He certainly will not improve, and with the passage of time and changes of age will probably become worse.
(c) A report by Dr. Frederick E. Vultee, dated December 19, 1957.[3] In his report Dr. Vultee made the following observations:
This patient has been followed by me since January of 1957. His history is that of a fracture dislocation of the right ankle on August 12, 1956, while on Active duty with, the National Guard. An open reduction and screw fixation of the right medial malleolus was required, fol *489 lowed by a long period of cast immobilization. The patient states that on November 6, 1957, at Walter Reed Army Hospital, surgical removal of the screw was accomplished.
His complaints both before and after removal of the screw, are those of progressive, painful inability to move the right ankle normally, together with weakness of the muscles of the right lower leg and foot. None of these complaints were present at any time prior to the date that the fracture was incurred.
Examination today revealed a well healed recent surgical incision approximately three inches in length over' the medial aspect of the right ankle. There was diffuse thickening of the entire right ankle, the maximum circumference of the right ankle, three inches above the heel, was 28.5 cm., and on the left was 28 cm. Range of motion measurements of the right ankle, with the foot in a neutral position, revealed twenty degrees of active plantar flexion with a forty-five degree normal expected, representing greater than fifty per cent loss of motion. There was five degrees of dorsiflexion with a twenty degree normal expected, representing seventy-five per cent loss of motion. Inversion was approximately ten degrees with a forty degree range expected, again representing seventy-five per cent loss of motion, and eversion was not possible, with a twenty degree normal expected, representing one hundred per cent loss of motion, here. There was moderately severe atrophy of the musculature of the right lower leg, and detailed maximum muscle testing of the muscles within the average muscle range, revealed the gastrocnemius to be approximately fifty per cent of expected strength, and the anterior tibial muscle also was diminuted in strength approximately fifty per cent of normal.
The diagnostic impression remains unchanged, being: Arthritis, traumatic right ankle secondary to fractured dislocation. The disability, in the opinion of the undersigned, remains at a minimum of thirty per cent.
In addition to presenting the above-described medical reports, plaintiff gave testimony in his own behalf before the PEB. He related the limitations on his physical activities, and described the discomfort and nearly continuous pain he experienced. He stated that there had been no change in the condition of his ankle since the screw had been removed and that he continued to experience weakness in the leg and lower extremity. Plaintiff also described the loss in size and *490 strength of the muscle in his right leg which caused him to experience undue fatigue. Plaintiff demonstrated the variance in size of his legs, and the medical member of the PEB noted “some slight atrophy” of plaintiff’s right leg compared to his left.[4] Following demonstrations by plaintiff, the medical member also observed that plaintiff was unable to stand on the toes of his right foot. He was unable to raise his right foot but could raise his left. When asked to demonstrate inversion and eversion with his right foot plaintiff was unable to do so. In response to further inquiry by the medical member, plaintiff explained, specifically and in detail, the nature and extent of the nearly continuous pain which he had experienced from his disability. The medical member remarked that he had not found in the prior record any statement of the very severe pain then being described, and he wondered if prior examiners had understood the nature of the pain. Plaintiff thought his incapacitation stemmed not only from the pain but also from limitation of motion and loss of strength in his leg. Plaintiff further described in detail how his leg would “give out” on him after he had been walking, or even standing, for an appreciable period of time. He also experienced considerable difficulty in going up and down stairs.
11. The Physical Evaluation Board found plaintiff unfit for further military service by reason of: Arthritis due to direct trauma, right ankle, when plaintiff sustained the fracture of the medial malleolus. The degree of severity was reported as: Limited motion marked, dorsiflexion 90°, plantar flexion 135° under Veterans Administration Diagnostic Code 5010-5271.[5] He was considered 20 percent perma *491 nently disabled and was recommended for separation with severance pay. In his report dated 23 December 1957, the president of the PEB stated:
The testimony of the patient and the two exhibits added to this record confirm that the limitation of motion can be described as marked. The muscle atrophy appears to be more due to disuse than to any injury of disease process. The constant pain according to the member’s testimony is one cause of the limitation of motion and is the reason that this formal board raised his disability from “moderate” to “marked.” Nothing in the testimony, in the opinion of this board, provides any basis upon which the percentage of the disability could be increased to 30% or more.
Plaintiff did not concur with the findings of the PEB and on December 23,1957, filed a rebuttal thereto for the purpose of requesting the Physical Review Council (PRC) to take into account, not only the limitation of motion of the ankle, but also the loss of size and strength of his lower right leg which he claimed adversely affected his whole body.
In addition, on December 31, 1957, plaintiff’s employer, First and Merchants National Bank of Richmond, wrote a letter to a member of the House of Representatives explaining the nature of plaintiff’s promotional duties as Trust Officer for the bank, which duties required a great deal of physical activity, energy, walking, and driving. Said the author of the letter:
Following the accident of August 12, 1956 and his extended period of hospitalization, Colonel Thompson has a marked limp in his right leg and to a layman it is clear that he suffers considerable pain, is far less active than before and not only is it clear that his effective representation of the bank has been materially reduced, it is not unreasonable to look to the future with some reservation about his continued effectiveness and his opportunities for further advancement.
Even to a casual observer, it is clear that Colonel Thompson, as a result of the accident of August 12,1956, is far removed from the physically strong, healthy ana effective individual he once was. Again, from a layman’s point of view, it would certainly appear that the disability allowance of 20% decided upon is far less than it should be.
*492 The bank’s letter regarding the effect of plaintiff’s injury on his employment was forwarded to the PRC by the addressee — congressman on January 3, 1956.
12. On February 10, 1958, the PRC reviewed the proceedings of the PEB, together with plaintiff’s rebuttal submissions, and recommended that the findings of the PEB be approved.[6] Thereupon, those findings were approved by order of the Secretary of the Army on March 17, 1958. This information was communicated to the Adjutant General, State of Virginia, on April 15, 1958, and plaintiff was separated from the Virginia National Guard due to physical disability with severance pay of $14,976 based upon a 20 percent disability rating.
13. On June 30, 1958, plaintiff filed an application with the Veterans Administration for disability compensation. On November 4, 1958, he underwent a physical examination for evaluation of his disability. At VA’s request, Drs. Vultee and Deyerle again furnished reports on their examinations of plaintiff. On December 8,1958, a Veterans Administration rating panel awarded plaintiff a 10 percent disability rating as of July 7, 1958, for traumatic arthritis, right ankle, under VADC 5010. On January 16,1964, plaintiff was reexamined by the Veterans Administration, and the original rating decision was confirmed. It is not clear from the record whether the VA examiners were aware of the PEB’s rating of 20 percent disability under VADC 5271.
14. On April 30, 1964, shortly after suit was filed in this court, plaintiff filed an application for correction of military records with the Army Board for Corrections of'Military Records requesting that his records be corrected to show his retirement by reason of physical disability (40%). On July 29, 1964, the Correction Board requested the Physical Standards Division of the Surgeon General’s Office (SGO) to furnish it with “a comprehensive opinion for the guidance of the Board regarding the medical issues raised by the applicant.”
*493 On August 5, 1964, the SGO requested YA to furnish it plaintiff’s entire claims folder for review in connection with the Correction Board’s proceedings. The folder was reviewed on August 7,1964, and on August 24,1964, the SGO formally advised the Correction Board that the 20 percent rating was “completely justified” and that there was no justification for a higher disability rating.
On May 8, 1965, the Correction Board requested a second advisory opinion from the SGO which was furnished on June 16, 1965. The second advisory opinion stated:
1. Records in the case of the above-named individual have again been reviewed in this office, together with the Orthopedic Consultant to The Surgeon General.
2. The VA Schedule for Rating Disabilities requires that the associated findings of atrophy and loss of motion be considered in rating this man’s condition, which should be evaluated as it was in 1957.- The Schedule also states that findings cannot be pyramided. Thus, the Amputation Rule (paragraph 68, ibid.) states that combined evaluations for disabilities below the knee shall not exceed the 40% evaluation for VA diagnostic Code 5165. For these reasons this officer cannot be rated at 40%, which is the rating for a satisfactory below the knee amputation, {VA Codes 5165 and 5166), for loss of use of the foot (VA Code 5167), and for ankylosis of the ankle in poor position (VA Code 5270); nor can he be rated at 30%, which is the rating for ankylosis of the ankle in a position better than poor (VA Code 5270). The previous recommendation of a 20% rating is reaffirmed by the Orthopedic Consultant to The Surgeon General, who is of the opinion that a 20% rating is justified and just and that the applicant is entitled to no more. He was originally given a VA award of 10%, and if he feels his disability is increased, he can apply to the VA for an increased disability rating. He would not be found unfit and processed through the disability retirement system at the present time, and an increased rating is not indicated or warranted for medical reasons.
3. In view of the above, the opinion is expressed that an increase of his disability rating is not indicated or warranted and that 20% represents the proper permanent evaluation of the disabilities in the case.
On November 3, 1965, without granting plaintiff’s request for a hearing, the Correction Board denied plaintiff’s appli *494 cation for correction of his military records. He was advised of the denial by letter dated December 20, 1965. Thereafter, the suit in this court was reactivated and proceeded to pretrial and trial.
15, At the trial in this court, plaintiff presented medical testimony by a recognized expert in the field of orthopedics, Dr. Allen M. Ferry. His testimony followed closely an earlier evaluation report which Dr. Ferry had prepared following a personal examination of plaintiff on March 5, 1965.[7] This report constitutes an adequate summary of Dr. Ferry’s findings in 1965 and of his testimony at the trial herein. After briefly noting the circumstances of plaintiff’s injury and ensuing' surgery at Quantieo Hospital, Dr. Ferry stated:
* * * There followed a long period of treatment of the ankle. Apparently there was a delay in union of the fracture requiring a long period of using a walking cast. Ultimately, the fracture united and ultimately the pin was removed from the inner ankle bone. The patient had much physiotherapy thereafter at Walter Reed Hospital in attempt to restore motion and circulation. After maximum of improvement had apparently taken place, the patient still continued and continues to have-trouble with the ankle. He states that when he walks on rough ground, he frequently trips over the forefoot because he cannot elevate it as well as the other foot.. There has been wasting of the muscles of the right leg, as compared to the left. He has more or less continuous pain in the ankle all the time. This is aggravated by being on his feet a lot, by yard work, by playing golf, hunting, etc., and has occasional soreness on the outer side of the right thigh. He states that his left hip “goes out”, this is relieved by applying pressure to it. Driving a lot aggravates his ankle condition, so that when he gets out of his car from driving? it is subject to increased
?>ain. At times the right foot is so touchy and uncom-_ ortable that the weight of his other foot resting on it is painful. At times, there is swelling of the ankle.
PHYSICAL EXAMINATION: Examination at this time, reveals no measured swelling of the right ankle, although it appears to be slightly thickened as compared *495 to the left. The right calf measures 15" in circumference as compared to 161/4" in circumference of the left leg. The right thigh shows about 14" less circumference than the left thigh, not of significant difference. The scar over the medial side of the right ankle is well healed and is not particularly painful, tender, etc. There is about 10 degrees limitation of dorsi flexion of the right foot, plantar flexion is almost complete. Trying to force motions beyond these points produces discomfort. I see no evidence of shortening 01 either extremity as compared to its opposite one.
X-RAY EXAMINATION: X-rays including multiple views of the right ankle were taken and compared with x-rays taken the same day of the left ankle. There is indeed, extensive traumatic arthritic change present in the right foot and ankle as compared with the left, x-rayed for comparative purposed [sic]. It would appear that the surgery originally done to fix the fracture, worked out well, but with considerable proliferation of bone about the internal malleolus and some about the external malleolus. The overall position of the mortise remains very, good, but hypertrophic degenerative' changes have set-in [sic] and involved not only the internal and externa] malleolus, but also the articular surface of the astragalus with the tibia. On the other hand, the.opposite foot shows very little in the way of degenerative changes present.
DIAGNOSIS: Traumatic arthritis of right ankle, secondary. to fracture of right ankle of August, 1956.
I believe this process is fairly marked at this time and it is quite probable that it will tend to get worse in the future. It is possible that fusion of the ankle to relieve discomfort may ultimately be necessary. At the present time,, though the patient is apparently considerably handicapped by the ankle, still I do not feel that the incapacity seems sufficient to make it mandatory to do an ankle fusion at this time.
As far as rating of disability at this time is concerned, I feel that based on the patient’s story and the objective x-ray changes, I believe that the patient’s present disability amounts, to about 30% permanent partial disability of the right leg.
Dr. Ferry’s 30 percent disability rating was based on his findings of limitation of motion, atrophy of the leg, X-ray findings of severe traumatic arthritis, and plaintiff’s statements as to the behavior of his limb. In arriving at said per *496 centage figure, Dr. Ferry did not have in mind the VA Schedule for Eating Disabilities.
16. One of two Government expert witnesses at the trial in this court was Dr. Eobert A. Muilenburg. He was chairman of the VA Disability Policy Board which writes amendments to the VA Schedule and renders advice thereon to both the VA rating boards and to the various military departments. According to Dr. Muilenburg, the degree of severity of plaintiff’s disability was “cast in terms of limitation of motion.” He felt that the question of whether the amount of plaintiff’s limitation was marked (20 percent) or moderate (10 percent) was one on which reasonable men might differ under VADC 5271. He would not take serious issue with either rating. While he had never personally examined plaintiff, he had noted “other findings” in the. Army and VA examination reports, namely, osteoporosis of the bones of the foot and leg, atrophy of muscles of the leg below the knee, and swelling of the ankle joint.
Osteoporosis consists of demineralization, or decalcification, of a bone usually arising from temporary or permanent disuse of the bone. The condition has no significance in this case because it “probably has no effect whatsoever in terms of disability.” Muscle atrophy and diminution of size of plaintiff’s right calf are expected conditions secondary to traumatic arthritis and are attributable to disuse of the leg stemming from pain and discomfort suffered by the ambulating patient. In Dr. Muilenburg’s view as an expert on the VA Eating Schedule, it would be improper to rate plaintiff independently under the Schedule Instructions dealing with muscle injury, weakness, and muscle damage, which includes VADC 5311 and 5312, relied upon by plaintiff for an additional 20 percent rating. This opinion was based upon his belief that those diagnostic codes deal with injuries to muscles brought about by bullets, shell fragments, or other direct injuries to the muscles themselves. No such direct muscle injury is present in plaintiff’s case.
Dr. Muilenburg’s conclusion was that VADC 5010 and 5271 were the proper codes for application in this case.
17. The other expert witness called by the Government was Colonel Charles W. Metz, Jr., Chief of' Orthopedic *497 Service, Walter Keed Army Hospital, He was the orthopedic consultant to the Surgeon General referred to in the SGO advisory opinions mentioned in finding 14, supra. Like Hr. Muilenburg, Colonel Metz had never personally examined plaintiff, but had studied the prior medical reports and other files. He remained in accord with the SGO advisory opinions regarding plaintiff’s case.
Traumatic arthritis should be rated by analogy to limitation of motion under VADC 5271. Swelling and muscle atrophy are considered to be within the rating for the limitation of motion as explained in the Schedule at paragraph 6 of The Musculoskeletal System reading, in pertinent part:
6. The Joints. — As regards the joints the factors of disability reside in reductions of their normal excursion of movements in different planes. Inquiry will be directed to these considerations:
*****
(6) Pain on movement, swelling, deformity or atrophy of disuse. Instability of station, disturbance of locomotion, interference with sitting, standing and weigh-bearing [sic] are related considerations. For the purpose of rating disability from arthritis, the, shoulder, elbow, wrist, hip, knee, and ankle are considered major joints; * * *
Muscle atrophy is visible evidence of the arthritis and is one of the elements taken into consideration in arriving at the rating for arthritis of a particular joint. In his evaluation of plaintiff’s disability, Colonel Metz had noted the VA rating of 10 percent for “moderate” limitation of motion, and, considering the degree of plaintiff’s limitation of motion, it was Metz’s opinion that the VA rating was “more realistic” than the PEB rating of 20 percent for “marked” limitation. However, he concluded that plaintiff was entitled to “the benefit of the doubt” and that the 20 percent rating was justified when compared, for example, to the 20 percent rating assigned to ankylosis (a completely solid ankle) in good position which has the same range of motion as plaintiff’s range.[8]
*498 To Colonel Metz, however, any larger rating than 20 percent could not be justified because such an increase would amount to “pyramiding” which is prohibited by. the Schedule in the following language:
14. Avoidance of Pyramiding. — The evaluation of the same disability under various diagnoses is to be avoided. Disability from injuries to the muscles, nerves, and joints of an extremity may overlap to a great extent, so that special rules are included in the appropriate section for their evaluation. Dyspnea, tachycardia, nervousness, fatigability, etc., may result from many causes, some may be service connected, others, not. Both the use of manifestations not resulting from service-connected disease or injury' in establishing the service-connected evaluation,, and the evaluation of the same manifestation under different diagnoses'are to be avoided.
Since osteoporosis and muscle atrophy are to be expected' in cases of traumatic arthritis and have been taken into account in rating that disability, a separate rating for those > conditions under the leg muscle provisions of the Schedule (VADC 5311 and 5312) would constitute an evaluation of the-same manifestation under different diagnoses which is prohibited by the above-quoted provision of the Schedule. The atrophy and weakness of plaintiff’s calf muscles is simply part and parcel of the arthritis syndrome and are already taken into account in that rating. Plaintiff’s effort to add to> his rating for traumatic arthritis an additional rating for muscle involvement under VADC 5311 and 5312[9] would only be acceptable if plaintiff had sustained a direct injury to the muscle involved,[10] and there is no evidence that he had ever *499 suffered any such direct injury to the atrophied muscle. The muscle atrophy and all other secondary symptoms described by plaintiff are all attributable solely to his arthritis.
18. Plaintiff also testified in his own behalf. He described the early injury to his right ankle incurred while playing football at the University of Delaware in the fall of 1933, After the injury, he continued to play at his position of fullback for the balance of the 1933 season. However, by the time the basketball season had commenced, his ankle had become so sore that he sought medical aid and, by X-ray examination, it was determined that he had suffered a “bone chip” on the outer side of his right ankle. The “chip” was successfully removed by surgery in January 1934, and he had no further difficulty with his ankle until he suffered the service-incurred injury thereto in August 1956. He specifically denied that he had complained to a Service medical examiner in August 1952 of arthritis and occasional pain from the 1933 injury. See finding 1, supra.
Plaintiff recounted the pain and discomfort which he experiences on standing or walking even for short periods of time. He suffers back pains on shifting his weight from one leg to the other, has difficulty going up and down stairs due to his limitation of motion, and has tripped and fallen on numerous occasions from loss of balance. His ankle swells every evening; his driving is affected by pain and discomfort experienced in using the gas pedal; he cannot run, walk fast, or turn quickly; and he has a limp whether or not he feels pain in the anide. In summary, plaintiff stated that there had been no improvement in the adverse symptoms which he had previously described to the PEB and to his doctors in 1957. See finding 10, supra.
Ultimate Findings op Fact
19. The evidence in this case shows that, in the view of an orthopedic expert, plaintiff’s actual physical disability attributable to his service-incurred injury amounts to 30 percent or more.
20. The evidence is clear, however, that under the Veterans Administration Schedule for Rating Disabilities, plaintiff *500 has properly been assigned a maximum rating for his particular disability of 20 percent. Nothing in the administrative proceedings has been shown to constitute arbitrary, capricious, or unlawful action.
CONCLUSION OF LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and his petition, as amended, is dismissed.

 The medial malleolus is the inner side of the ankle joint, an extension of the tibia which is the long weight-bearing bone of the leg.

 On August 17, Quantico certifled that plaintiff would have -an. estimated temporary disability for three months “and possible permanent disability.”

 At the time of this report, Dr. Vultee was an assistant professor at the Medical College of Virginia. However, while on active duty as Assistant Chief of the Physical Medicine Service at Walter Reed, Dr. Vultee had examined and treated plaintiff In early 1957.

 In response to the medical member’s question as to how long this discrepancy in size had been present, plaintiff responded, rather incomprehensibly, that it had been present “Since the accident.”

 VADC 5010:
Arthritis, due to direct trauma :
Minimum rating_ 1Ó
Note — Rate only in the presence of a basic dislocation, mal-union, limitation of motion, or painful motion of a joint affected by fracture, irregular joint surfaces, loose or foreign bodies, etc.; not to be applied following simple sprain or history of dislocation.
VADC 5271:
Ankle, limited motion of:
Marked __ 20
Moderate _ 10

 There is no record of the proceedings, composition,, or membership of the RRC.

 A copy of Dr. Ferry’s report was furnished to the Board for Correction tpt .Military Records in connection with the Board’s consideration of plaintiff’s application for correction of his records.

 This was a proper conclusion since the VA Schedule, in paragraph 7 of the General Policy in Rating, requires that if there is a reasonable doubt “aB to which of two ratings shall be applied in any given case, the claimant Is entitled to the higher.”

 VADC 5311 provides for a 20 percent rating In eases of moderately severe Injury to “Posterior and lateral crural muscles. Muscles of the calf. (1) Triceps surae (gastrocnemius and soleus) ; (2) tibialis posterior; (3) peroneus longus; (4) flexor hallucis longus; (5) flexor digitorum longus; (6) popliteus. (Function: Propulsion, plantar flexion of foot (1) ; stabilizing arch (2,3) flexion of toes (4,5) ; flexion of knee (6).)
VADC 5312 also provides for a 20 percent rating in cases.of moderately severe injury to “Anterior muscles of the leg. (1) Tibialis anterior; (2) long extensors of toes; (3) peroneus tertius. (Function; Dorsiflexion (1), extension of toes (2), stabilizing arch (3).)
Plaintiff claims to be entitled to an additional 20 percent rating unddf either or both of these sections.

 In this connection, notice is taken of paragraph 11 of the Schedule under The Musculoskeletal System, which provides that, in case of muscle injuries, “Disability from injuries of muscles presents a special problem. Shrapnel and shell fragments and high velocity buUets may inflict massive damage upoh muscles with permanent residuals. The principal symptoms of disability from tsuch muscle injuries are weakness, undue fatigue-pain, and uncertainty Ói incoordination óf movement.* * *”